UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| FREMONT TELCOM CO., d/b/a BLACKFOOT COMMUNICATIONS,<br><br>        Plaintiff,<br>v.<br><br>KYLE ENTERPRISES, LLC, d/b/a MILLENNIUM,<br><br>        Defendant. | Case No.: 26-CV-338<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Fremont Telcom Co., d/b/a Blackfoot Communications ("Blackfoot"), for its Complaint against Defendant Kyle Enterprises, LLC, d/b/a Millennium ("Millennium"), states and alleges the following:

### NATURE OF THE ACTION

1. Blackfoot is a Montana-based corporation that provides residential and commercial telecommunications and Internet services, including voice, broadband, and fiber-based connectivity.

2. To operate its fiber optic Internet services, Blackfoot requires usable fiber optic cable that will go into the ground to transmit data throughout its fiber optic network.

3. Blackfoot, therefore, orders fiber optic cable from vendors across the country, including Millennium, a supplier of fiber optic network materials based in Walworth County, Wisconsin.

4. Between December 2021 and April 2023, Blackfoot paid Millennium $377,631.36 for fiber optic cable, $22,657.86 in sales tax, and $4,000 in shipping costs, for a total of $404,289.22.

5. As Blackfoot began to install the fiber delivered by Millennium, it discovered the fiber was defective, nonconforming, and unusable.

6. Blackfoot promptly informed Millennium's Blackfoot Account Manager, who acknowledged that the defects Blackfoot discovered were known to Millennium.

7. Millennium vowed to work with Blackfoot so that Blackfoot could receive the usable fiber it paid for.

8. But once Millennium realized it could not obtain usable fiber from the manufacturer, Millennium reneged on that promise—just as it had reneged on its promise and duty to deliver usable fiber to Blackfoot in the first instance.

9. Blackfoot is entitled to compensatory damages to reimburse Blackfoot for its purchase of useless fiber and to prevent Millennium from unjust enrichment.

10. Blackfoot is also entitled to the incidental and consequential damages that resulted from Millennium's conduct.

**PARTIES**

11. Blackfoot is a corporation registered in the State of Idaho with its principal place of business in Missoula, Montana.

12. Millennium is a Wisconsin limited liability company with its principal place of business in Delavan, Wisconsin.

**JURISDICTION & VENUE**

13. The Court has personal jurisdiction over the parties and controversy pursuant to 28 U.S.C. § 1332 because the amount in controversy is greater than $75,000 and the adverse parties are citizens of different states.

14. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Millennium resides in Wisconsin and is subject to personal jurisdiction in this district.

15. Millennium previously asserted that venue is proper in this Court. On January 12, 2026, Hon. John T. Johnston in the United States District Court for the District of Montana dismissed a similar case that arose out of the same facts, *Fremont Telcom Co., d/b/a Blackfoot Communications v. Kyle Enterprises, LLC, d/b/a Millennium*, Case No. 25-84-M-JTJ (D. Mont.), pursuant to the doctrine of *forum non conveniens*. In that order, the court noted that "Millennium contends the parties entered a binding contract containing a valid, mandatory forum-selection clause requiring all disputes to be brought in a state or federal court with jurisdiction in Walworth County, Wisconsin."

## FACTUAL ALLEGATIONS

16. Blackfoot realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

17. Between 2021 and 2022, Blackfoot representatives in Missoula negotiated with Millennium's representative to purchase fiber optic cable from Millennium.

18. Between November 2021 and January 2022, Blackfoot ordered fiber optic cable products from Millennium. Although all negotiations and payments were made from Blackfoot's Missoula office, the fiber optic cable was to be delivered to St. Anthony, Idaho, for a fiber optic cable project Blackfoot was undertaking there.

19. On or around November 16, 2021, Blackfoot ordered Millennium's Item Number "Fiber 96" as part of "PO # FMT100415-1," attached hereto as **Exhibit A**. Blackfoot paid $67,343.04 for the product, $4,040.58 in tax, and $4,000 in shipping, for a total payment of

$75,383.62. Blackfoot received the November 16, 2021, order of Fiber 96 on or around November 24, 2021.

20. On or around January 21, 2022, Blackfoot ordered Millenium's Item Numbers "Fiber 288," "Fiber 144," "Fiber 96," and "Fiber 48" as part of "PO # FMT100460-1," attached hereto as **Exhibit B**. Blackfoot paid $133,547.28 for the product and $8,012.83 in tax, for a total payment of $141,560.11. Blackfoot received the January 21, 2022, order of Fiber 288, Fiber 144, Fiber 96, and Fiber 48 on August 31, 2022, September 21, 2022, and March 23, 2023.

21. On or around January 25, 2022, Blackfoot ordered Millenium's Item Numbers "Fiber 288," "Fiber 144," "Fiber 96," and "Fiber 48" as part of "PO # FMT100459-1," attached hereto as **Exhibit C**. Blackfoot paid $176,741.04 for the product and $10,604.45 in tax, for a total payment of $187,345.49. Blackfoot received the January 25, 2022, order of Fiber 288, Fiber 144, Fiber 96, and Fiber 48 on August 4, 2022, August 31, 2022, September 9, 2022, October 31, 2022, and December 27, 2022.

22. The total amount paid by Blackfoot for the three orders was $404,289.22.

23. All the fiber optic cable delivered by Millennium to Blackfoot to fulfill the November 16, 2021, January 21, 2022, and January 25, 2022, orders was defective, nonconforming, and unusable.

24. Blackfoot was unaware that the fiber optic cable was defective, nonconforming, and unusable at the time of delivery. Discovery of the defects and nonconformity was not possible before Blackfoot's attempt to install the fiber optic cable.

25. In line with industry standard practice, Blackfoot discovered the defects and nonconformity of the fiber optic cable at the time of installation.

26. In late 2023, after the fiber optic cable was blown into conduits, Blackfoot contracted with splicers who attempted to "splice," or join, the fiber optic cable that Blackfoot purchased from Millennium. The contract splicers could not complete their work because as they attempted to use pull strings to remove the sheath and shield around the fiber optic cable, the pull strings would break. As a result, Blackfoot could not splice the fiber optic cable, rendering it unusable.

27. Blackfoot's Procurement Manager notified Millennium's Blackfoot Account Manager in January 2024 that the fiber delivered to Blackfoot was defective, nonconforming, and unusable.

28. As part of that notification, Blackfoot provided photographs and detailed information about the defective fiber to Millennium.

29. Millennium informed Blackfoot that the issue it was experiencing was known to Fiber Optic Network Cable Solutions ("FONCS"), the manufacturer of the defective fiber optic cable. Millennium is a distributor of fiber optic cable and a customer of FONCS.

30. Blackfoot contacted a representative of FONCS and confirmed that FONCS was aware of the defective fiber issue. FONCS also advised that other customers had experienced the same problem and been given credits or replacement fiber optic cable. A representative of FONCS told Blackfoot's Procurement Manager that Blackfoot needed to have its distributor, Millennium, get in contact with FONCS to begin the process of getting the defective fiber optic cable replaced.

31. FONCS also claimed that a tool called an Armored Fiber Optic Cable Splitter would remedy the issue. Blackfoot acquired the costly tool, as recommended. However, even with use of the tool, the fiber was still unusable.

32. Millennium's Blackfoot Account Manager vowed to work with Blackfoot so that Blackfoot could receive the usable fiber it paid for.

33. As several months dragged on, Millennium's Account Manager represented in his communications to Blackfoot that Millennium was "fighting this battle for you," that Millennium was "doing everything we can to resolve this," and that the Account Manager "do[es]n't mind fighting for what is fair."

34. On July 26, 2024, Millennium's Account Manager reached back out to Blackfoot's Procurement Manager, apologizing for the situation while reassuring Blackfoot that "[w]e are still working on getting a solution" and acknowledging that "this is a very unique situation that we've never had to deal with."

35. On September 10, 2024, when Blackfoot still did not have usable fiber optic cable, Millennium's Account Manager told other employees at Millennium, copying Blackfoot's Procurement Manager, that "[t]his just needs to get resolved before q4 and [Blackfoot] start[s] planning their buying for 2025."

36. On October 15, 2024, Blackfoot's Procurement Manager spoke with Millennium's Account Manager to inform Blackfoot that FONCS would not be doing anything about the defective and nonconforming fiber optic cable.

37. During that conversation, Millennium's Account Manager said that Millennium would put together a package to resolve the problem for Blackfoot.

38. Millennium failed to follow through and instead, several months later, offered Blackfoot a 10% discount on future purchases, capped at $300,000. In other words, Millennium requested Blackfoot to spend $3,000,000 to receive the offered $300,000 discount on future

purchases. Blackfoot rejected this offer, which was hardly the "fair" solution Millennium vowed to "fight for" on behalf of Blackfoot.

39. Blackfoot timely revoked its initial acceptance of the fiber optic cable because the fiber optic cable was defective, nonconforming, and unusable through no fault of Blackfoot.

## CAUSES OF ACTION

## COUNT I – BREACH OF CONTRACT

40. Blackfoot realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

41. Blackfoot and Millennium were parties to three separate orders for the purchase of fiber optic cable.

42. The first purchase agreement was entered on or around November 16, 2021. The second purchase agreement was entered on or around January 21, 2022. The third purchase agreement was entered on or around January 25, 2022.

43. Blackfoot performed its obligations under these purchase agreements by paying $75,383.62 for the November 16, 2021, order, $141,560.11 for the January 21, 2022, order, and $187,345.49 for the January 25, 2022, order.

44. Millennium breached each of these purchase agreements by failing to deliver non-defective and usable fiber optic cable.

45. Millennium further breached each of these purchase agreements by failing to remedy the defective and nonconforming fiber optic cable, despite representations to Blackfoot that it would fix these issues for Blackfoot.

46. Millennium further breached each of these purchase agreements by acts to be proven at trial.

47. Millennium's breaches of each of these purchase agreements directly damaged Blackfoot.

48. By reason of the conduct described above, Millennium is liable to Blackfoot for breach of contract.

**COUNT II – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

49. Blackfoot realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

50. Millennium is a merchant with respect to the defective and nonconforming fiber optic cable at issue in this case.

51. The fiber optic cable that Millennium sold to Blackfoot on or around November 16, 2021, January 21, 2022, and January 25, 2022, was not merchantable at the time of sale.

52. Millennium knew of the defects associated with the fiber optic cable it sold to Blackfoot.

53. Millennium's defective, nonconforming, and unusable fiber optic cable directly and proximately caused damages to Blackfoot.

54. Blackfoot provided timely notice of the defective, nonconforming, and unusable fiber optic cable to Millennium.

55. By reason of the conduct described above, Millennium is liable to Blackfoot for breach of the implied warranty of merchantability.

**COUNT III – BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**

56. Blackfoot realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

57. Under Wis. Stat. § 402.315,

> [w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under s. 402.316 an implied warranty that the goods shall be fit for such purpose.

58. At the time of Blackfoot's orders of fiber optic cable from Millennium, Millennium knew that Blackfoot specifically needed usable fiber optic cable to complete a fiber optic cable project.

59. Blackfoot relied on Millennium to supply fiber optic cable that was suitable for Blackfoot's fiber optic cable project.

60. Millennium sold Blackfoot fiber optic cable on or around November 16, 2021, January 21, 2022, and January 25, 2022.

61. The fiber optic cable was not fit for Blackfoot's particular purpose of needing usable fiber optic cable to complete a fiber optic cable project.

62. Millennium's defective, nonconforming, and unusable fiber optic cable was unfit for the particular purpose for which Blackfoot was purchasing the fiber optic cable, and directly and proximately caused damages to Blackfoot.

63. Blackfoot provided timely notice of the defective, nonconforming, and unusable fiber optic cable to Millennium.

64. There was an implied warranty of fitness for a particular purpose with respect to the fiber optic cable pursuant to Wis. Stat. § 402.315.

65. None of the exclusions or modifications identified in Wis. Stat. § 402.316 apply to the implied warranty of fitness for a particular purpose covering the fiber optic cable.

66. Millennium's defective, nonconforming, and unusable fiber optic cable violated the implied warranty of fitness for a particular purpose that existed pursuant to Wis. Stat. § 402.315.

67. By reason of the conduct described above, Millennium is liable to Blackfoot for breach of the implied warranty of fitness for a particular purpose.

## COUNT IV – UNJUST ENRICHMENT

68. Blackfoot realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

69. Millennium received a substantial benefit by accepting payment for the defective, nonconforming, and unusable fiber optic cable delivered to Blackfoot.

70. Millennium received unwarranted benefits by accepting payment from Blackfoot after Millennium delivered defective, nonconforming, and unusable fiber optic cable to Blackfoot.

71. Blackfoot is entitled to damages because Millennium was unjustly enriched by accepting payment from Blackfoot after Millennium delivered defective, nonconforming, and unusable fiber optic cable to Blackfoot.

72. By reason of the conduct described above, Millennium is liable to Blackfoot for unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Blackfoot requests judgment in its favor and against Millennium as follows:

1. For compensatory damages in an amount to be proven at trial;

2. For incidental and consequential damages in an amount to be proven at trial;

3. For costs and fees, including attorneys' fees, as may be available under law; and

4. For such additional relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Blackfoot demands a trial by jury on all issues so triable.

Dated this 24th day of February, 2026.

          By:    *Electronically signed by Jacob B. Harris*
                Jacob B. Harris (SBN 1095224)
                Paige E. Sprink (SBN 1122772)
                HUSCH BLACKWELL LLP
                33 E Main Street
                Suite #300
                Madison, WI 53701
                (608) 234-6019
                Jacob.Harris@huschblackwell.com
                Paige.Sprink@huschblackwell.com

                *Attorneys for Fremont Telcom Co., d/b/a Blackfoot Communications*